# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs December 2, 2019

## IN RE DRAVEN K.

**Appeal from the Juvenile Court for Knox County**
**No. 611354   Timothy E. Irwin, Judge**

_____

### No. E2019-00768-COA-R3-PT

_____

This is a termination of parental rights case. Mother/Appellant appeals the trial court's termination of her parental rights to the minor child on the grounds of: (1) abandonment by willful failure to visit and abandonment by failure to provide a suitable home, Tenn. Code Ann. § 36-1-113(g)(1), §§ 36-1-102(1)(A)(i) (ii); (2) persistence of the conditions that led to the child's removal, Tenn. Code Ann. § 36-1-113(g)(3); (3) failure to substantially comply with the reasonable requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and (4) failure to manifest an ability and willingness to assume custody or financial responsibility for the child, Tenn. Code Ann. § 36-1-113(g)(14). Mother also appeals the trial court's determination that termination of her parental rights is in the child's best interest. Because the record does not contain an adjudicatory order of dependency and neglect, we reverse the trial court's termination of Mother's parental rights on the ground of persistence of conditions. We affirm the trial court's termination of Mother's parental rights on all other grounds and on its finding that termination of Mother's rights is in the child's best interest.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Reversed in Part, Affirmed in Part, and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Anna East Corcoran, Knoxville, Tennessee, for the appellant, Amanda S.[1]

Herbert H. Slatery, III, Attorney General and Reporter, Jeffrey D. Ridner, Assistant Attorney General, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

# OPINION

## I. Background

Draven K. was born, in November 2012, to Appellant Amanda S. ("Mother") and Charles K. ("Father"),[2] who were never married. On or about April 19, 2016, Appellee Tennessee Department of Children's Services ("DCS") received a report of harm alleging that Draven was unsupervised, neglected, and exposed to drug use in Mother's home. The report alleged that police had responded to Mother's home where Father had overdosed on prescription medication, which he had obtained illegally. The report further alleged that Mother was aware of Father's drug use. Mother's home was reportedly unsafe and unsanitary. Law enforcement removed Draven from the home and placed her with Marilyn B., a non-relative.

On April 20, 2016, Child Protective Services ("CPS") visited Mother's home. The CPS investigator reported that Mother had cleaned the house since the previous night. Mother informed the CPS investigator that Father did not reside at the home. CPS referred Mother for a mental health assessment, and Draven returned to Mother's home on or about April 21, 2016.

On May 25, 2016, DCS received a second referral alleging that Mother's home was again unsafe and unsanitary. The report further indicated that Mother and Father had engaged in fighting and yelling, and Father was observed chasing Mother around the yard. On May 26, 2016, CPS again visited Mother's home. Both parents were present and reported that there was no drug use in the home. However, Father submitted to a drug test, which was positive for buprenorphine. He then reported that he had taken Suboxone, which he obtained "off the street." Mother also submitted to a drug test, which was negative. The CPS agent observed that the home was extremely messy—the kitchen sink was full of dirty dishes; there was "black grime" on the washer and dryer; trash was strewn about the house; there was no food in the house; the sheetrock in Devon's room had crumbled leaving debris on the floor and bed; and there were no sheets on the child's bed. Mother reported that she had not completed the mental health assessment requested by CPS following the initial home visit in April 2016. CPS completed an immediate protection agreement with the parents and placed Draven with Marilyn B., a non-relative.

On or about June 6, 2016, Marilyn B. filed a petition seeking a temporary restraining order against Mother and Father. The Juvenile Court of Knox County ('trial court") granted the petition and transferred temporary physical custody of Draven to Marilyn B. The trial court prohibited Mother and Father from having contact with the

---

[2] DCS sought termination of Father's parental rights in a separate proceeding, and he is not a party to this appeal

child or interfering with Marilyn B.'s care and custody. On June 10, 2016, DCS filed a motion to intervene and for temporary custody. Therein, DCS alleged that Draven was "dependent and neglected . . . because of substance abuse issues, environmental neglect and lack of supervision." On August 31, 2016, the trial court entered a "Bench Order— Custody to DCS Dependency & Neglect," wherein it found that "there is probable cause to believe the child is dependent and neglected." The trial court's finding was based on the parents': (1) unresolved alcohol, drug, and mental health issues; (2) environmental neglect; and (3) lack of supervision. The trial court noted that Marilyn B. was no longer available as a placement resource for the child and granted temporary custody to DCS. Draven was placed in foster care on August 31, 2016, where she has remained since that time. An attorney was appointed to represent Mother, and a guardian ad litem was appointed for Draven.

On September 22, 2016, DCS entered into a permanency plan with Mother. DCS and Mother developed subsequent permanency plans, on April 7, 2017 and November 7, 2017, but Mother's requirements did not change. The trial court ratified all of these plans, under which Mother was required to: (1) visit Draven regularly; (2) complete a mental health assessment and follow all recommendations until successful completion; (3) complete parenting classes to learn the necessary skills to be a stable parent and demonstrate retention of those skills during visitation; (4) maintain stable and adequate housing free from any environmental hazards; (5) maintain contact and cooperate with DCS; (6) maintain a legal source of income sufficient to meet her own needs and those of the child; (7) submit to random drug screens; and (8) have a reliable means of transportation. According to affidavits of reasonable effort filed by DCS, it assisted Mother with the foregoing tasks by: (1) assigning a case worker to maintain contact with Mother and engage her in the process of compliance with the plans; (2) offering to schedule and pay for Mother's mental health assessment; (3) providing Mother with bus passes; and (4) facilitating therapeutic visitations between Mother and Draven.

Mother subsequently completed a mental health assessment. The assessment recommended that Mother complete six months of individual therapy. Mother began therapy in April 2017, but she stopped attending after only a few sessions. Mother completed parenting classes. Mother submitted to drug screens, which were all negative. In addition, Mother cooperated with DCS, maintained contact with Ms. Julianna Denes, the DCS case worker, and attended court hearings.

On November 29, 2016, the trial court held a review hearing and continued custody with DCS. On December 14, 2016, the trial court entered an order, wherein it found that DCS had made reasonable efforts to assist Mother. The trial court found that Mother had made progress toward resolving the issues that led to Draven's removal from her custody, but that she still "needs to find housing; complete parenting classes; and get engaged in recommend[ations] [from her] mental health [evaluation]."

On June 27, 2017, the trial court entered an order following a status hearing. Therein, the trial court noted that DCS continued to make reasonable efforts to assist Mother, including assistance with housing. Although the trial court noted Mother's progress, it concluded that she still was not compliant with her mental health recommendations and that she was also not compliant with therapeutic visitation. However, based on Mother's efforts, she progressed to unsupervised visitation in late 2017 with the possibility of a trial home placement.

Initially, Mother's unsupervised visits went well; however, in January 2018, Mother became involved with Jonathan L. DCS instructed Mother that Jonathan L. was not to be around Draven during visitation. Nonetheless, on January 7, 2018, during a visit with Mother, Draven was involved in a motor vehicle accident. Although the child was not injured in the accident, she witnessed Jonathan L. engaged in a fight with the driver of the other vehicle. Draven disclosed the event to Ms. Julianna Denes, the DCS caseworker, who then questioned Mother. Mother admitted that Jonathan L. had fought with the other driver and had his "eyebrow split open" when the other driver slammed Jonathan L.'s head against a car. Mother admitted that she had taken Draven with her "to the hospital with Mr. [L.] to have his eyebrow glued shut." Following this event, DCS ceased Draven's unsupervised visits with Mother.

Ms. Denes testified that, at a child and family team meeting in January 2018, Mother's behavior was odd. Ms. Denes stated that Mother "kind of spaced out, and while we were discussing the seriousness of the events, she started talking about getting roses the day before . . . and completely kind of went—off topic." Ms. Denes stated that Mother showed no remorse over the incident with Mr. L. and never acknowledged that her behavior was inappropriate. Nonetheless, following the January 2018 meeting, Mother was granted supervised visitation with Draven. However, based on Mother's odd behavior at the January meeting, DCS required her to obtain a full psychological exam. DCS scheduled the evaluation for February 27, 2018, but Mother failed to appear. Mother rescheduled the evaluation for April 13, 2018. The April examination recommended psychotherapy and medication management for Mother's mental health issues. On or about June 25, 2018, Megan Farmer replaced Ms. Denes as Draven's DCS case manager.

In June 2018, Mother contacted Ms. Farmer and requested that DCS suspend her visitation because she was allegedly starting the required therapy, and it was too difficult for her to attend therapy and visit with Draven. In July 2018, Mother still had not begun therapy. Ms. Farmer contacted Mother and asked if she wanted to resume visits. Mother stated that she did not, but asked Ms. Farmer to provide her bus passes. Ms. Farmer informed Mother that DCS would not provide bus passes so long as Mother was not attending therapy and was not visiting the child. Thereafter, Mother requested visitation. Although DCS arranged at least eight visits, the record shows that Mother only attended three.

On November 9, 2018, DCS filed its petition to terminate Mother's parental rights. The trial court heard the petition on April 3, 2019. Although Mother was present at the hearing, she did not testify. By order of April 25, 2019, the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; (4) persistence of the conditions that led to the child's removal; and (5) failure to manifest an ability and willingness to assume custody. The trial court also found that termination of Mother's parental rights is in the child's best interest. Mother appeals.

## II. Issues

There are two dispositive issues, which we state as follows:

1. Whether there is clear and convincing evidence to support any of the grounds the trial court relied on in terminating Mother's parental rights?

2. If so, whether there is clear and convincing evidence to support the trial court's determination that termination of Mother's parental rights is in the Child's best interest?

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence

"establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.***

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). On appeal, we review the trial court's findings of fact "*de novo* on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." ***In re Taylor B.W.***, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We must then make our "own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." ***In re Bernard T.***, 319 S.W.3d 586, 596-97 (Tenn. 2010). We review the trial court's conclusions of law *de novo* with no presumption of correctness. ***In re J.C.D.***, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## IV. Grounds for Termination of Mother's Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." ***In re Angela E.***, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

### A. Abandonment by Failure to Visit

The trial court terminated Mother's parental rights on the ground of abandonment by failure to visit. In pertinent part, Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . .

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as follows:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians . . . have failed to visit . . . the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, the petition to terminate Appellant's parental rights was filed on November 9, 2018; therefore, the relevant four-month time period is from July 9, 2018 until November 8, 2018. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

Tennessee Code Annotated Section 36-1-102(1)(C) further provides that,

[f]or purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]

This court has emphasized that "visitation is not a rote statutory requirement; it is necessary to maintain the thread of the parent-child relationship[.]" *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 (Tenn. Ct. App. June 16, 2011). An absence of contact between a parent and child for an extended period of time can lead to, in effect, the "death" of the relationship. *Id.* "Whether a parent failed to visit . . . a child is a question of fact. Whether a parent's failure to visit . . . constitutes willful abandonment . . . is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. Ct. App. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). As previously discussed, this Court reviews questions of law *de novo* with no presumption of correctness. *Id.*

Prior to 2018, the statutory definition of abandonment placed the burden of proof on the petitioner to show that the parent's failure to visit was "willful." In 2018, the General Assembly amended the statute to shift the burden of proof to the parent or guardian to show that his or her failure to visit was not willful. For cases filed on or after July 1, 2018, Tennessee Code Annotated section 36-1-102(1)(I) now provides that:

For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence

- 7 -

of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure

Tenn. Code Ann. § 36-1-102(1)(I). Here, DCS filed its petition on November 9, 2018; accordingly, Mother has the burden to show that her failure to visit the Child was not willful. Concerning the concept of willfulness in the context of abandonment for purposes of termination of parental rights, this Court has stated:

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. Aug. 25, 2005) (internal citations and footnotes omitted).

In its order terminating Appellant's parental rights, the trial court made the following relevant findings concerning this ground:

> [T]he Court finds that there is clear and convincing evidence that in the four months before the petition to terminate parental rights was filed on November 9, 2018, [Mother] engaged in token visitation with the child. [Mother] had the opportunity to visit eight times during that period for two hours each. [Mother] chose to only visit three times in that period, on August 14, 2018; September 12, 2018; and on October 24, 2018. [Mother] was not incapacitated in any way during this period and was aware of the visitation opportunities. [Mother] did not attempt to make up or reschedule the visitation. [Mother] knew the consequence of her failure to visit her child because she had received the Criteria for Termination of Parental Rights document on multiple occasions. FSW Farmer reminded [Mother] that her failure to visit the child regularly could result in this abandonment being used to terminate her parental rights.

As discussed above, the purpose of visitation is to develop a bond and relationship between the parent and the child. The concern here is not that Mother failed to visit the child at all; rather, the issue is that Mother failed to engage with the child during the visits such that these visits constituted nothing more than perfunctory or "token" visitation. Ms. Farmer testified, in relevant part:

> Q. [H]ave you had the opportunity to observe [Mother] in her interactions with Draven?
> A. Yes. I have.
> Q. And did you observe her demonstrating skills that she would have learned through the parenting education that she attended?
> A. I did not observe that. [Mother] hardly interacts with Draven[; she] doesn't talk with [Draven] or play with her. Draven will ask [Mother] to play . . . and [Mother[ will say, "I'm just going to watch you," and she will stay on the couch while Draven plays on the floor after several requests from Draven to play with her.

Concerning whether DCS's provision of therapeutic visitation helped Mother to progress in her parenting skills, Ms. Farmer testified, that "[a]fter four months of therapeutic visitation, the visitation quality did not improve." In its order terminating Mother's parental rights, the trial court further held that

> [Mother] did not maintain regular visitation and the visits she did complete were of low quality. Visitation supervisors testified that [Mother] did not appear bonded with the child, that she was not interactive or engaging and often sat alone on the couch despite the child's attempts to engage [Mother]. The therapeutic visitation supervisor repeatedly attempted to engage [Mother] with the child to no avail.

The evidence supports the trial court's holding. Ms. Farmer's testimony, *supra*, is undisputed. It is also undisputed that Mother knew the importance of visiting with the child and was informed on several occasions that failure to engage in this process could result in termination of her parental rights. There is no evidence to suggest that Mother was incapacitated or otherwise unable to engage in visitation with Draven. Mother's lackadaisical attitude during visits, her failure to play with the child, and her shunning of the child's attempts to engage, has resulted in a lack of even the most tenuous bond between Mother and child. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by failure to visit.

## 2. Abandonment by Failure Provide a Suitable Home

Tennessee Code Annotated Section 36-1-113(g)(1) authorizes termination of

parental rights on the ground of abandonment as defined by Tennessee Code Annotated Section 36-1-102(1)(A)(ii):

> (ii) The child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

A suitable home "requires more than a proper physical living location." **In re Hannah H**., No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting **State v. C.W.**, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)).

As set out in context above Tennessee Code Annotated Section 36-1-102(1)(A)(ii)'s definition of abandonment requires DCS to make reasonable efforts to assist the parents to establish a suitable home. DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." **In re Kaliyah S.**, 455 S.W.3d 533, n. 34 (citing Tenn. Code. Ann. § 36-1-102(1)(A)(ii)).

In its order terminating Mother's parental rights, the trial court found that despite reasonable efforts by DCS, there was clear and convincing evidence to support termination of her parental rights on the ground of abandonment by failure to provide a suitable home, to-wit:

> [T]he Court finds that there is clear and convincing evidence that despite reasonable efforts being made by the state, [Mother] has not made reciprocal reasonable efforts to provide a suitable home. Instead, she has failed to comply with recommendations of her assessments and has not adequately addressed her mental health condition. [Mother] resided at [a] shelter early on in the case and eventually did obtain her own apartment in early 2019. [Mother] has not allowed DCS to complete a home visit at her

current residence and the condition of her residence is not known. FSW Farmer attempted to schedule home visits on multiple occasions and at one point drove over to [Mother's] home and was able to observe through the window that [Mother] did not appear to have any furniture in the home and there was a large pile of clothing on the floor in the living room.

\*\*\*

[Mother's] failure to make even minimal efforts to improve her home and personal condition demonstrates a lack of concern for the child to such a degree that it appears unlikely that she will be able to provide a suitable home for the child at an early date.

\*\*\*

In the more than two years since the removal [of the Child from Mother's custody], [DCS] has made reasonable efforts to assist [Mother] to establish a suitable home for the child by referring or otherwise providing opportunities for the following: supervised visitation, therapeutic visitation, parenting education, mental health assessment, psychological evaluation, mental health treatment, family therapy, individual therapy, alcohol and drug assessment, random drug screens, Knox County resource guide, home visits, child support services, housing resources, bus passes, and ongoing case management. Despite these efforts, [Mother] had not demonstrated an ability to provide a suitable home to which the child could return.

Appellants do not raise an issue concerning the trial court's findings on DCS's reasonable efforts. However, because DCS's obligation to provide reasonable efforts is triggered by the trial court's reliance on the ground of abandonment by failure to provide suitable housing, we have reviewed the record to determine whether the evidence preponderates in favor of the trial court's findings concerning reasonable efforts. Concerning DCS's efforts to assist Mother, Ms. Farmer testified:

Q. What efforts did the Department make to assist [Mother] to accomplish those action steps under the plan?
A. The Department offered to help schedule a mental health assessment and pay for that mental health assessment. [Mother] reported that she was in a program . . . to find housing, so she was working toward that. We also gave her bus passes to attend any appointment that she had and visits that she needed to attend with Drave.
Q. Was [Mother] provided with contact information for a DCS case manager?
A. Yes.

- 11 -

Q. And did DCS attempt to maintain contact with [Mother] and engage her in this proves throughout the entirety of this case?
A. Yes.

Ms. Farmer's testimony is undisputed. Furthermore, the affidavits of reasonable efforts, which were filed by DCS throughout these proceedings, are also undisputed. From the record, therefore, we conclude that the evidence supports the trial court's determination that DCS made reasonable efforts to assist Mother.

Concerning Mother's home, Ms. Farmer further testified that

[Mother] notified me [that she had found housing] in February [2019], and I asked to schedule a visit to come out and see the housing, but [Mother] said that she would have to get back to me about when I could come. She never returned my phone calls or text messages in attempts to schedule.

After unsuccessful attempts to set up a time to visit Mother's home, Ms. Farmer testified that she went to the house in April 2019. Mother was not home, but Ms. Farmer stated that "[a]s I was knocking on the door, I was able to look in and observe no furniture and just a pile of clothes . . . in the middle of the floor . . . ." Ms. Farmer further testified that,

[a]s I was leaving, I observe[d] [Mother] at the bus stop near the apartment complex, so I pulled over and talked with her and asked again to schedule a time to meet . . . and she would not schedule a time. I asked her to contact me, and she has not contacted me.

More important than the lack of furnishings in Mother's home is Mother's refusal to cooperate with DCS. Mother's behavior in ignoring Ms. Farmer's requests for a home visit suggests a deeper problem. Mother's failure to address her mental health issues renders her unable to provide a safe and stable environment for the child and shows a lack of concern for the child and a lack of interest in regaining custody. From the record, there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by failure to provide a suitable home.

### B. Persistence of Conditions

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of persistence of the conditions that led to the Child's removal from her custody. Tenn. Code Ann. § 36-1-113(g)(3). Tennessee Code Annotated section 36-1-113(g)(3) defines persistence of conditions as follows:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status . . . if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

In *In re Audrey S.*, this Court held that based on the statutory text and its historical development, the ground of persistence of conditions found in Tennessee Code Annotated section 36-1-113(g)(3) provides a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. *In re Audrey S.*, 182 S.W.3d at 872. Relying on *In re Audrey S.*, this Court has explained that

[w]hen a child has been alleged dependent, neglected or abused, there are three types of hearings th[at] follow: (1) preliminary, (2) adjudicatory, and (3) dispositional. *In re Audrey S.*, 182 S.W.3d at 874 (citations omitted). The purpose of an adjudicatory hearing is to determine whether the allegations of dependency, neglect or abuse are true. *Id.* In an adjudicatory hearing, the Rules of Evidence apply and the trial court must find that the children are dependent, neglected or abused **by clear and convincing evidence**. *Id.* at 874-75 (citations omitted). On the other hand, a preliminary hearing, which occurs prior to the adjudicatory hearing, is only to allow the trial court to determine whether the child should be removed pending the adjudicatory hearing. *Id.* at 875 (citations omitted). In making this determination, the trial court may consider reliable hearsay and **must only find probable cause** to believe the child is dependent, neglected or abused in order to remove the child. *Id.* Because of these differences, **an order from a preliminary hearing, based on a finding of probable**

**cause, is not a judicial finding of dependency, neglect or abuse**. *Id.* Consequently, it cannot give rise to grounds of persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) in a termination proceeding. *Id.*

*State, Dept. of Children's Services v. Hood*, 338 S.W.3d 917, 927-28 (Tenn. Ct. App. 2010) (emphases added).

As noted above, in the dependency and neglect proceedings, the trial court entered an order on August 31, 2016, finding, in relevant part, that "there is probable cause to believe the child is dependent and neglected." Although our record contains subsequent orders from the trial court, none of these orders adjudicate dependency and neglect by clear and convincing evidence. As discussed by this Court in *Hood*, "a finding of probable cause [of dependency and neglect,] is not a judicial finding of dependency, neglect or abuse neglected in accordance with *In re Audrey S.*" In the absence of a judicial finding of dependency, neglect or abuse, by clear and convincing evidence, persistence of conditions under Tennessee Code Annotated section 36-1-113(g) cannot be a ground for termination of parental rights. Accordingly, we reverse the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the child's removal from Mother's custody.

### C. Failure to Substantially Comply with the Requirement of the Permanency Plan

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

- 14 -

Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id.* at 656-57. The Tennessee Supreme Court has explained that

[s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

In its order terminating her parental rights, the trial court made the following relevant findings concerning Mother's failure to substantially comply with the reasonable requirements of the permanency plan:

[Mother] did not complete many of her responsibilities under the permanency plan. [Mother] did complete a mental health assessment . . . but did not follow the treatment recommendations for individual therapy. [Mother] completed a psychological evaluation . . . but did not complete the recommendations for that evaluation. [Mother] did submit to random drug screens and was negative for all substances on the drug screens. . . . [Mother] would not set up a home visit . . . and the present condition of [Mother's] home is not known other than what was observed [by FSW Farmer] from the window. [Mother] has had inconsistent employment throughout the case reporting that she has obtained different jobs and been

- 15 -

fired shortly thereafter. [Mother] reported new employment approximately two weeks prior to this hearing.

In early 2017, [Mother] progressed to unsupervised visitation; however, [Mother] chose to allow a boyfriend . . . to participate in the unsupervised visit after being repeatedly admonished by DCS that [he] was not to have contact with the child . . . .

Turning to the record, Ms. Farmer testified:

Q. What of those actions steps [in the permanency plans] did [Mother] successfully complete?
A. [Mother] completed a mental health assessment, but did not engage in mental health treatment.
Q. Was that a recommendation of her assessment?
A. Yes., it was recommended that she complete six months of [] therapy, individual therapy.
Q. And did she start that therapy?
A. She had started at one point in April of 2017, but only attended a few sessions and then stopped attending. And then she started again in September of 2018, and has been consistently, but the notes reported that she's uncooperative and her speech is minimal when participating in those therapy sessions.
Q. Are there any other responsibilities or action steps that [Mother] has completed successfully?
A. She completed parenting classes, but the visit—the engagement that she displayed in her visits with Drave was still concerning so we asked her to participate in therapeutic visitation one time.

***

Q. When you say that she completed the parenting classes, was the requirement under the permanency plan that she just complete the classes, or that she complete them and demonstrate the skills that she's learned.
A. Yes, she was to demonstrate the skills that she's learned in her visits and her interactions with Draven.

As discussed above, Ms. Farmer went on to testify that Mother failed to demonstrate good parenting skills in her visits with Draven. Mother was not engaged with the child, and she made no efforts to bond with Draven. Ms. Farmer's testimony is undisputed. Ms. Farmer also testified that Mother had not demonstrated the ability to maintain a suitable home for the child.

- 16 -

In its order terminating Mother's parental rights, the trial court held, in relevant part, that

> [Mother] failed to address her mental health concerns and was not able to make progress in the visitation with her child despite two episodes [of] therapeutic visitation being provided by DCS and despite [Mother's] completion of parenting classes. [Mother] was not receptive to instruction and did not demonstrate any of the skills she should have learned in parenting classes, therapy, and therapeutic visitation sessions.

The record supports the trial court's findings. Although Mother submitted to a mental health evaluation and also attending parenting classes, she did not follow the recommendations. Substantial compliance with the permanency plan requires the parent to engage fully in the process so as to achieve the ultimate goal of curing those issues that preclude the parent from obtaining or maintaining custody. From the undisputed testimony, Mother failed to engage in the substantive requirements of the permanency plans because she failed to address her mental health issues, parenting issues, and housing issues. As such, the record clearly and convincingly supports the trial court's decision to terminate Mother's parental rights on the ground of failure to substantially comply with the reasonable requirements of the permanency plan.

### D. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of a parent's parental rights when he or she:

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination of parental rights was added to the statute effective July 1, 2016. *See* 2016 Tenn. Pub. Acts, c. 919, § 20. Concerning the substantive requirements to meet the burden of proof, in ***In re Maya R.***, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018), we explained that, first, the petitioner must prove that the parent has failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." ***Id.***

Concerning the first prong, i.e., whether the parent has failed to manifest an ability and willingness to personally assume custody and financial responsibility of the Child, there has been some disagreement in this Court regarding the measure of proof required to satisfy this burden. In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court held:

> As to the first prong [of Tennessee Code Annotated Section 36-1-113(g)(14)], the statute requires the party seeking termination to prove a negative: that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Here, despite finding that the parents "ha[d not] failed to manifest a willingness to assume custody" and that the "parents want these children," the juvenile court concluded DCS proved by clear and convincing evidence this ground against both parents. The court based its conclusion on the finding that the parents "d[id not] have the ability" to personally assume custody of the children.

> In general, "statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." *Stewart v. State*, 33 S.W.3d 785, 792 (Tenn. 2000). In the context of a "negative proof" connected by the word "and," a party "must prove that . . . all" of the listed items were not met. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 120 (2012).

> At oral argument, DCS urged that we interpret the word "and" in the disjunctive so that it only had to prove an inability or unwillingness of the parents to assume custody of the children. Our supreme court has "recognized that the word 'and' can also be construed in the disjunctive where such a construction is necessary to further the intent of the legislature." *Stewart v. State*, 33 S.W.3d at 792. But because "we generally presume that the General Assembly purposefully chooses the words used in statutory language," *id.*; *cf.* Scalia & Garner, *supra*, at 116 ("Under the conjunctive/disjunctive canon, and combines items while or creates alternatives."), and the presumption has not been rebutted, we decline to adopt DCS's interpretation here.

> We conclude that Tennessee Code Annotated § 36-1-113(g)(14) could not serve as a basis for terminating Mother's and Father's parental rights. The proof at trial negated a required element of the statutory ground. The juvenile court found: "In this case, these parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children."

- 18 -

However, in the subsequent case of ***In re Amynn K.***, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018), a panel of this Court parsed the conjunctive (as opposed to disjunctive) language used in Tennessee Code Annotated section 36-1-113(g)(14) and compared the statutory language to other similar statutes before holding that

> [u]pon consideration of the statutory language and the relevant legal authority, we hold that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

***Id.*** at \*14. This dispute continues in cases where a parent manifests a willingness to assume custody and financial responsibility but is simply unable to do so; however, this is not such a case. In cases, such as the one at bar, where the parent has manifested neither a willingness nor an ability to assume custody and responsibility, this Court has upheld termination of the parent's parental rights on this ground. *See, e.g.*, ***In re J'Khari F.***, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at \*15 (Tenn. Ct. App. Jan. 31, 2019) (noting both ***In re Ayden S.*** and ***In re Amynn K.*** but ultimately concluding that DCS presented sufficient evidence that "Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child"); ***In re Colton B.***, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at \*9-10 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) (noting the split in authority but holding that it was unnecessary to choose one approach where the parent had manifested neither an ability nor a willingness to parent the child). Likewise, here, the trial court found that Mother has "failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody of the child." The trial court specifically found that Mother "has not substantially complied with her responsibilities under the permanency plan and has not shown initiative to engage with her child at visitation." The trial court further noted that Mother "has not allowed DCS to complete a home visit and [that she] misses, is late, or leave[s] visitation early."

For many of the reasons discussed above, there is clear and convincing evidence to support the trial court's finding that Mother failed to manifest an ability and willingness to assume custody. Mother failed to provide a suitable home for the child. Mother failed to engage in meaningful visitation with the child. More importantly, however, Mother failed to follow the recommendations of her mental health assessment. There is no indication that Mother was unable to do these things. As such, we can only infer that she was unwilling to do them.

- 19 -

Turning to the second prong of Tennessee Code Annotated section 36-1-113(g)(14), i.e., whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," this Court has explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). Concerning this prong, the trial court found that "the child and [Mother] do not appear to be bonded . . . and the child has adverse behaviors following contact with [Mother]. Placing the child in [Mother's] legal and physical custody would pose a risk of substantial harm to the psychological welfare of the child." From our review of the record, the trial court's findings are supported by clear and convincing evidence. As discussed above, Daven is not bonded with Mother. Furthermore, Ms. Farmer testified that Mother's "mental health concerns are of great[est] concern. Her judgment and decision making are a part of that as well." Ms. Farmer referred to the fact that Mother had allowed Mr. L. to attend one of Mother's unsupervised visit, and the child was exposed to a violent event. Despite the uncontested fact that DCS had insisted that Mother not bring Mr. L. around the child, Mother did so anyway.

Ms. Farmer further testified that

> [w]hen I would pick Draven up from school to transport her to the visit, she would say that she never wanted to see Mommy [] again, that she didn't want to go. . . . [M]any times Draven . . . will not look at the mother, will not sit near her or play with her.

Draven's foster mother testified that, following visits with Mother, Draven would be withdrawn, very quiet, and uncommunicative about the visits. Draven also exhibited negative behaviors, including lying, cursing, and stealing, after she visited with Mother.

From the totality of the circumstances, there is clear and convincing evidence to suggest that placing Draven in Mother's custody would pose a substantial risk to Draven's psychological welfare. For the foregoing reasons, we affirm the trial court's

termination of Mother's parental rights on the ground of failure to manifest a willingness and ability to assume custody.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). As the Tennessee Supreme Court recently explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

*In re Gabriella D*., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> ***
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

- 21 -

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

***

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child. . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*Moody*, 171 S.W.3d at 194.

Concerning the child's best interest, the trial court made the following findings:

A. [Mother] has not made changes in her conduct or circumstances that would make it safe for the child to go home. She still has: no proof of safe and appropriate housing, not adequately addressed her mental health needs, not complied with therapeutic visitation, parenting class and family therapy recommendations to assist her in bonding with her child.
B. [Mother] has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite help from the state like referring or otherwise

providing opportunities for the following: supervised visitation, therapeutic visitation, parenting education, mental health assessment, psychological evaluation, mental health treatment, family therapy, individual therapy, alcohol and drug assessment, random drug screens, Knox County resource guide, home visits, child support services, housing resources, bus passes, and ongoing case management, for over two years, she still has not made progress in bonding with her child, has not provided proof of safe and stable housing and has not adequately addressed her mental health needs.

C. [Mother] has not maintained regular visitation with the child.

D. There is no meaningful relationship between the child and [Mother].

E. Changing caregivers at this stage of the child's life will have a detrimental effect on her. The child expresses concerning behaviors when she has contact with [Mother] and is very bonded with her foster family.

F. [Mother's] mental or emotional state would be detrimental to the child and would prevent her from effectively parenting the child.

G. [Mother] has shown little or no interest in the welfare of the child.

H. The child has established a strong bond with her foster parents, who wish to adopt her.

I. The child has expressed repeatedly that she does not want to return to [Mother's] home and want to [] remain with her foster family.

The trial court's findings are supported by the record. As discussed in detail above, Mother failed to address her mental health issues. She has not demonstrated an ability or willingness to parent this child. Mother's decision to ignore DCS's admonition that Mother keep Mr. L. away from Draven resulted in Draven witnessing a violent event. Mother's decision not only shows a lack of parenting skills, but also solidifies her ongoing pattern of behaviors showing a lack of interest in the child's welfare.

Draven has no bond with Mother. However, from the undisputed testimony, Draven has bonded with her foster parents, who wish to adopt her. She has integrated well into their home. By all accounts, Draven is well adjusted, with the sole exception of the negative behaviors she demonstrated before and after visits with Mother. It is clear from the record that a change in caregivers at this point would have a detrimental effect on Draven's emotional and psychological welfare. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in Draven's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the child's removal. We affirm the trial court's termination of Mother's parental rights on all other grounds and on its finding that termination of Mother's parental rights is in the child's

best interest.  The case is remanded for such further proceedings as may be necessary and are consistent with this opinion.  Costs of the appeal are assessed to the Appellant, Amanda S.  Because Amanda S. is proceeding, *in forma pauperis*, in this appeal, execution for costs may issue if necessary.


_____
KENNY ARMSTRONG, JUDGE